**Judy FRIELER, Appellant,**

v.

**CARLSON MARKETING GROUP, INC., Respondent.**

No. A06–1693.

Supreme Court of Minnesota.

May 30, 2008.

Frances E. Baillon, Joni M. Thome, Halunen & Associates, Minneapolis, MN, for Appellant.

Steven W. Wilson, Eric J. Magnuson, Gregory J. Stenmoe, Briggs and Morgan, P.A., Minneapolis, MN, for Respondent.

Leslie L. Lienemann, Culberth & Lienemann, L.L.P., St. Paul, MN, for Amicus Curiae National Employment Lawyers Ass'n.

Lori Swanson, Attorney General, Kelly S. Kemp, Assistant Attorney General, St. Paul, MN, for Amicus Curiae Minnesota Department of Human Rights.

Kerry L. Middleton, Sarah J. Gorajski, Littler Medelson, P.C., Minneapolis, MN, for Amicus Curiae of Employers Association, Inc.

Joseph G. Schmitt, Peter D. Gray, Megan J. Backer, Halleland, Lewis, Nilan & Johnson, P.A., Minneapolis, MN, for Amicus Curiae Minnesota Chamber of Commerce.

John J. McDonald, Jr., Bradley J. Lindeman, Jacalyn N. Chinander, Meagher & Geer, P.L.L.P., Minneapolis, MN, for Amicus Curiae Minnesota Defense Lawyers Ass'n.

Robert R. Reinhart, Marilyn J. Clark, Dorsey & Whitney, L.L.P., Minneapolis, MN, for Amicus Curiae Minnesota Employment Law Council.

OPINION AND DISSENT [1]

PAGE, Justice.

Appellant Judy Frieler (Frieler) sued respondent Carlson Marketing Group, Inc. (CMG), in 2006 for violating the Minnesota Human Rights Act (MHRA), Minn.Stat. §§ 363A.03, subd. 43, and 363A.08, subd. 2 (2006), based on a hostile working environment due to sexual harassment by a supervisor, and for assault and battery. The district court granted CMG's motion for summary judgment, concluding that Frieler failed to raise an issue of material fact regarding whether: (1) CMG knew or should have known about the supervisor's harassment; (2) the supervisor was Frieler's supervisor for vicarious liability purposes; and (3) sexual harassment was foreseeable either at CMG or in CMG's industry. The court of appeals affirmed. With respect to Frieler's claim of sexual harassment under the MHRA, we reverse and remand, see parts I–IV *infra*, and with respect to her claim for assault and battery, we affirm. See part II of opinion of Justice Gildea.

Frieler began working in a part-time position at CMG in 1991. She eventually became interested in a full-time position and made that interest known to her direct supervisor in the bindery department, David Weber (Weber). At some point, Frieler learned that there was a full-time opening in CMG's shipping department through a job posting. During the week of February 1, 2005, Frieler told Ed Janiak (Janiak), the shipping department supervisor, that she was interested in the opening. Janiak told her that the position had been filled. Sometime during the week of February 7, 2005, after Frieler told Weber she had a full-time offer at another company,

---

1. Parts I–IV of this opinion are the opinion of the court with respect to the Minnesota Human Rights Act claim.

Weber told her that the shipping department position was still open and that she should speak to Janiak. The second time Frieler spoke with Janiak regarding the position, he said the position was open and he would consider Frieler, along with another CMG employee. Frieler had no further contact with Janiak until February 23, 2005.

Frieler alleges that on four occasions between February 23, 2005, and March 9, 2005, Janiak sexually harassed her. On each occasion, Janiak told her he wanted to show her something related to the open shipping position. On three of the four occasions, Janiak brought her into a limited-access room requiring a key to enter. After they entered, Janiak closed the door, which locked automatically. Janiak then grabbed Frieler into a bear hug, grabbed her buttocks while pressing his erect penis against her body, put his hands under her shirt and groped her breasts, tried to kiss her, and told her that she was a "sex pot" and had been "making this old man horny for years and years." He would say, "[C]an you handle it? Can you handle it? I'm going to be your boss, you got to take it, you got to handle it." He also told Frieler that he was going out on a limb for her to get her the job. When he physically released her, he told her not to tell anyone, especially her sister-in-law, another CMG employee.

On March 9, 2005, Weber and Janiak were both present when Frieler accepted a verbal job offer for the full-time position in the shipping department. There is conflicting testimony about who made the decision to hire Frieler for this position. Janiak testified that Weber made the decision. Weber testified that he, "for the most part," made the decision, and that Janiak "had input" into it. Angela Krob (Krob), Weber's manager, testified that the decision to hire Frieler "was made as part of discussion in terms of Ed [Janiak], David [Weber], with input from myself."

CMG had a policy that prohibited sexual harassment, and Frieler was aware of this policy. Under the policy, a complainant should report sexual harassment to his or her supervisor, human resources, or the ethics hotline. Although Frieler told her sister-in-law and other members of her family about Janiak's assaults as they occurred, she did not report the harassment to CMG until March 10, 2005. She feared that if she reported the harassment, she might lose both her part-time position and the chance at the full-time position because Weber and Janiak were friends. She also did not want to cause trouble for Janiak's family.

On March 10, 2005, Frieler told two coworkers and her group leader, Vickie, about the harassment. Vickie insisted Frieler report the harassment to Weber. Weber, Krob, and Jackie Dahl (Dahl) [2] from human resources had a meeting with Frieler to discuss her allegations of sexual harassment by Janiak. In another meeting the next day, Frieler told Krob and Dahl that Janiak had been verbally harassing her for years and that other women would joke that he was her boyfriend and liked her.

Frieler was placed on paid leave for a week while an investigation was conducted. On March 11, 2005, Janiak admitted that he met with Frieler on the dates of the

**2.** CMG's antidiscrimination and harassment policy stated that a complainant should report sexual harassment to his or her supervisor, human resources, or the ethics hotline. There is a question of how extensive the policy was, whether all the employees knew of the policy, how the policy was disseminated to employees, whether all employees received training about the topic, and the extent to which Krob, Weber, and Dahl received updated training.

alleged harassment to show her job-related tasks but denied sexually harassing her. In addition, four other employees were interviewed about Frieler's allegations. They all stated that Janiak had never done anything to make them uncomfortable, and some of them expressed disbelief that Janiak could do what Frieler alleged.

Janiak resigned the following Monday, stating that his decision to leave was due to health issues and a desire to spend time with family. Weber and Dahl asked him to stay, but he refused.

Frieler testified that Dahl and Krob told her not to tell anybody at work about the harassment, but instead to explain her absence by saying she had family problems. When Frieler said she could not lie, Krob said to have the coworkers instead ask Krob, who would lie. Krob and Dahl "told her that she needed to forget about it now because it is over. [CMG] did what it needed to do." They also told her that, had Janiak not resigned, the inconclusive results of the investigation would have led to supervised meetings between Janiak and Frieler. After Frieler returned to work, she heard rumors that she was in drug rehab and had family problems. Other coworkers would not look at Frieler, and one asked "why did you do this" to Janiak. Frieler did not report this behavior to human resources but told Vickie.

Frieler saw a doctor and psychologist around April 1, 2005. After her second visit, the psychologist recommended that Frieler not return to any job at CMG. Frieler asserts that she suffers from posttraumatic stress disorder and major depression as a result of the harassment.

Frieler sued CMG for sexual harassment in violation of the MHRA, assault and battery, and negligent supervision and retention. CMG moved for summary judgment, and Frieler did not contest the motion with respect to her claims of negligent supervision and retention. The district court granted summary judgment on all the claims, concluding that Frieler failed to raise an issue of material fact regarding whether: (1) CMG knew or should have known about Janiak's harassment; (2) Janiak was Frieler's supervisor for vicarious-liability purposes; and (3) sexual harassment was foreseeable either at CMG or in CMG's industry.

The court of appeals affirmed. *Frieler v. Carlson Mktg. Group, Inc.*, No. A06–1693, 2007 WL 2107300 (Minn.App. July 24, 2007). With regard to the sexual harassment count, the court of appeals determined that: (1) Minnesota has not adopted the supervisor distinction or vicarious-liability standards set forth in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); (2) the "knows or should know" standard applied to claims of sexual harassment by a supervisor under the MHRA; (3) there was no evidence that CMG knew or should have known that Janiak sexually harassed Frieler; and (4) CMG took reasonable and appropriate actions in responding to Frieler's allegations. *Frieler,* 2007 WL 2107300 at *3–6. With respect to the assault and battery count, the court held that Frieler produced no expert testimony necessary to raise an issue of material fact regarding the foreseeability of sexual harassment within the industries of warehouse work or collation work. *Id.* at *6–7.

We granted review to Frieler on two issues: (1) whether the court of appeals erred when it held that Minnesota has not adopted the federal standard for imposing vicarious liability for harassment by a supervisor; and (2) whether the court of appeals erred when it determined that foreseeability for the assault and battery claim could be established only if Frieler

provided affidavit or expert testimony demonstrating that sexual harassment was a well-known workplace hazard within her industry. We also granted cross-review to CMG regarding whether Frieler established a genuine issue of material fact as to whether Janiak was a supervisor with authority over her.

When reviewing summary judgment on appeal, we ask whether there are any genuine issues of material fact for trial and whether the district court erred in its application of the law. *State v. French,* 460 N.W.2d 2, 4 (Minn.1990). In doing so, we "view the evidence in the light most favorable to the party against whom judgment was granted." *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). No genuine issue of material fact exists when " 'the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.' " *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "[S]ummary judgment is inappropriate if the nonmoving party has the burden of proof on an issue and presents *sufficient evidence* to permit reasonable persons to draw different conclusions." *Schroeder v. St. Louis County,* 708 N.W.2d 497, 507 (Minn.2006).

## I.

The first issue we address is whether the MHRA requires that a plaintiff alleging sexual harassment by a supervisor prove that his or her employer knew or should have known of the harassment and failed to take timely and appropriate ac-

tion. In order to answer this question, a brief history of Minnesota and federal law regarding sexual harassment is necessary.

Under the MHRA, an employer engages in a prohibited "unfair employment practice" when it "discriminate[s] against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" based on a person's sex. Minn.Stat. § 363A.08, subd. 2 (2006). Although the MHRA was amended to prohibit discrimination based on sex in 1969, it did not specifically define or prohibit sexual harassment. Act of June 6, 1969, ch. 975, § 3, 1969 Minn. Laws 1937, 1938 (codified at Minn.Stat. § 363.03, subd. 2 (1969)).

In *Continental Can Co., Inc. v. State,* we held that the prohibition against sex discrimination in the MHRA included a prohibition against sexual harassment. 297 N.W.2d 241, 249 (Minn.1980), *abrogated by Cummings v. Koehnen,* 568 N.W.2d 418, 423 n. 6 (Minn.1997). Relying on federal cases that had recognized claims for sexual harassment under Title VII of the 1964 Civil Rights Act,[3] we held "that the prohibition against sex discrimination in [the MHRA] includes sexual harassment which impacts on the conditions of employment when the employer knew or should have known of the employees' conduct alleged to constitute sexual harassment and fails to take timely and appropriate action." *Cont'l Can,* 297 N.W.2d at 246–49. Because the harassers in *Continental Can* were fellow employees of the plaintiff, we did not "decide what theory of liability is appropriate when the employer's agents and supervisors are the source of conduct

---

**3.** Pursuant to Title VII of the 1964 Civil Rights Act, it is an "unlawful employment practice for an employer—(1) * * * to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's * * * sex." 42 U.S.C. § 2000e–2(a) (2006). In *Meritor Savings Bank FSB v.*

*Vinson,* the Supreme Court ruled that sexual harassment that creates a hostile working environment is prohibited, even if the sexual harassment was not directly linked to the grant or denial of an economic benefit. 477 U.S. 57, 66–68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

alleged to constitute sexual harassment." *Id.* at 249 n. 5.

Two years later, the legislature amended the MHRA to state that sexual harassment was a form of sex discrimination prohibited not just in the workplace, but in housing and education as well. Act of Mar. 23, 1982, ch. 619, §§ 2–3, 1982 Minn. Laws 1508, 1511 (codified at Minn.Stat. § 363.01, subd. 10 (1982)). In addition, a definition of "sexual harassment" was added to the MHRA. *Id.* "Sexual harassment" was defined as

> unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature when:
>
> (1) submission to that conduct or communication is made a term or condition, either explicitly or implicitly, of obtaining employment * * *;
>
> (2) submission to or rejection of that conduct or communication by an individual is used as a factor in decisions affecting that individual's employment * * *; or
>
> (3) that conduct or communication has the purpose or effect of substantially interfering with an individual's employment * * *, or creating an intimidating, hostile, or offensive employment * * * environment; *and in the case of employment, the employer knows or should know of the existence of the harassment and fails to take timely and appropriate action.*

Minn.Stat. § 363.01, subd. 10a (1982) (emphasis added).

In 1998, the Supreme Court issued a pair of decisions addressing the issue of employer liability for sexual harassment committed by supervisors under Title VII.

*Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In those cases, the Supreme Court ultimately held:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257 (citation omitted); *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275 (citation omitted).

In 2001, the legislature amended the MHRA by eliminating the following phrase from the definition of "sexual harassment" in an employment setting: "the employer knows or should know of the existence of the harassment and fails to take timely and appropriate action." Act of May 24, 2001, ch. 194, § 1, 2001 Minn. Laws 723, 724 (codified at Minn.Stat. § 363.01, subd. 41(3) (Supp.2001)). Thus, the definition of "sexual harassment" in the MHRA in use at the time of Frieler's alleged harassment does not contain the "knows or should know" language. Minn.Stat. § 363A.03, subd. 43 (2006).[4]

---

4. In 2003, the MHRA was renumbered so that it is now found in chapter 363A of the Minnesota Statutes, and the definition section, including the definition of "sexual harassment," is now found in section 363A.03. *See* Minn. Stat. §§ 363A.01–.20, 363A.01–.41 (Supp. 2003).

## II.

The question, then, is whether, in order to maintain an action after the 2001 amendment, a plaintiff still must prove that his or her employer knew or should have known about the sexual harassment and failed to take timely and appropriate action when the alleged harasser is a supervisor. The court of appeals, relying on our decision in *Goins v. West Group*, 635 N.W.2d 717 (Minn.2001), held that the 2001 amendment did not eliminate the requirement that a plaintiff alleging sexual harassment by a supervisor must prove his or her employer knew or should have known about the sexual harassment and failed to take prompt and appropriate action.[5] *Frieler*, 2007 WL 2107300, at *3–4. CMG contends that the 2001 amendment did not change the law but rather merely conformed the definition of "sexual harassment" to other definitions in the MHRA, such as the definitions of "disability" or "family status," that contain no liability standard.

■ The question requires us to construe the MHRA, and our review is de novo. *See Brookfield Trade Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 393 (Minn.1998). "An amendment to a statute is normally presumed to change the law unless it appears that the legislature only intended to clarify the law." *CUNA Mut.*

*Ins. Soc. v. Comm'r of Revenue*, 647 N.W.2d 533, 540 n. 16 (Minn.2002).

It is clear in this case that the legislature intended to change the law when it amended the definition of "sexual harassment" in 2001. The elimination of a liability standard is a change in the law. We cannot ignore the legislature's action in eliminating the "knows or should know" language from the definition of "sexual harassment" as we determine what a plaintiff is required to prove in order to prevail on a claim of sexual harassment under the MHRA. *See Reiter v. Kiffmeyer*, 721 N.W.2d 908, 911 (Minn.2006) (noting that this court "will not read into a statute a provision that the legislature has omitted, either purposely or inadvertently").

Further, the contemporaneous history indicates that the 2001 amendment was intended to adopt the federal standard of liability for supervisor harassment. The Minnesota Department of Human Rights (Department) requested the amendment to the MHRA. *See* Hearing on H.F. 767, H. Comm. Civil Law, 82d Minn. Leg., Feb. 26, 2001 [hereinafter Hrg. on H.F. 767] (audio tape) (comments of Janeen Rosas, Minn. Comm'r of Human Rights). The Commissioner of Human Rights testified that the reason for the amendment was to have Minnesota law on supervisor sexual harassment "conform with" and be "parallel with federal law," specifically, *Ellerth* and *Faragher*.[6] *Id.; see also* Hearing on

---

5. In *Goins*, based on conduct that occurred in late 1997 and early 1998, well before the effective date of the 2001 amendment to the MHRA, we applied the 2000 version of the MHRA, which included the "knows or should know" language. 635 N.W.2d at 721–22; *see also* Minn.Stat. § 363A.01, subd. 41(3) (2000). Thus, in *Goins*, we had no reason to and did not address the issue of whether the "knows or should know" standard applied to sexual harassment claims after the 2001 amendment.

6. It is, of course, true that the Commissioner of Human Rights is not a member of the legislature. But it is also true that the Department requested this amendment, and that

it is the charge of the Commissioner and the Department to enforce the MHRA. *See* Minn. Stat. §§ 363A.05–.06, 363A.28–.33 (2006). Thus, these are not the statements of a person unconnected to the relevant statute, but instead, these are the comments of the main proponent of the amendment, describing its meaning and effect on the statute she enforces, and to whom this court may properly defer when interpreting the MHRA. *See Geo. A. Hormel Co. v. Asper*, 428 N.W.2d 47, 50 (Minn.1988). In fact, during the Senate hearings on the amendment, in response to questions, the Commissioner recommended that the legislature not incorporate the *Ellerth* and *Faragher* standard directly into the text of the

S.F. 1215, S. Judiciary Comm., 82d Minn. Leg., Apr. 3, 2001 [hereinafter Hrg. on S.F. 1215] (audio tape) (comments of Comm'r Rosas). During her testimony at legislative hearings, the Commissioner was expressly asked whether a strict-liability standard was being created by the 2001 amendment. Hrg. on H.F. 767 (question of Rep. Lipman); Hrg. on S.F. 1215 (question of Sen. Neuville). The Commissioner responded that, consistent with the current status of the law, there would be strict liability for cases of quid pro quo harassment, but that in other situations an employer would be able to avail itself of the affirmative defense outlined in *Ellerth* and *Faragher.* Hrg. on H.F. 767; Hrg. on S.F. 1215.

◼ Moreover, we note that since 2001, the Department has interpreted the amendment to mean that Minnesota law is consistent with federal law. "[A]n agency's interpretation of the statutes it administers is entitled to deference and should be upheld, absent a finding that it is in conflict with the express purpose of the Act and the intention of the legislature." *Geo. A. Hormel & Co. v. Asper,* 428 N.W.2d 47, 50 (Minn.1988).

◼ We conclude that the clear intent of the 2001 amendment to the definition of "sexual harassment" was to make Minnesota law on sexual harassment by supervisors consistent with federal law. Accordingly, we hold that a plaintiff who brings a claim under the MHRA for sexual harassment by a supervisor is not required to prove that his or her employer knew or should have known about the sexual harassment and failed to take timely and appropriate action.

### III.

◼ The next issue presented is what standard of liability should apply to a claim of sexual harassment by a supervisor under the MHRA. The act as now written is silent as to the standard to be applied. Frieler argues that a strict liability standard should apply to sexual harassment claims based on supervisor harassment.[7] She contends that under the plain wording of the MHRA, an employer is strictly liable for the sexual harassment of any employee if the employee can show he or she is a member of a protected class who was subject to unwelcome harassment based on sex that affected a term, condition, or privilege of employment. In essence, Frieler

MHRA because much of sexual harassment law is established by case law, and in her view, Minnesota courts would quickly apply the *Ellerth* and *Faragher* standard after the amendment. Hearing on S.F. 1215, S. Judiciary Comm., 82d Minn. Leg., Apr. 3, 2001 (audio tape) (comments of Janeen Rosas, Minn. Comm'r of Human Rights). The legislature subsequently adopted the Department's changes as recommended. As a result, it is appropriate to rely on the Commissioner's statements to the legislature about her proposed changes to the MHRA and the meaning of those changes when determining the effect of the 2001 amendment to the definition of sexual harassment in the MHRA.

7. Frieler did not argue to the lower courts that a strict liability standard should be ap-

plied to all claims of sexual harassment under the MHRA. While we generally do not consider issues a party did not raise below, we will do so in the interests of justice. *State v. Foreman,* 680 N.W.2d 536, 539 (Minn.2004). Frieler argued below that the 2001 amendment to the MHRA changed the standard of liability for sexual harassment committed by supervisors, and we granted CMG's cross-petition for review on the issue of whether Janiak is a supervisor under the *Ellerth/Faragher* standard. Implicit in these arguments is the overarching question of what liability standard should be applied to sexual harassment claims based on supervisor harassment. Because of this, and because the parties have fully briefed this legal question, we believe it is in the interests of justice to consider this issue.

is arguing that by removing the "knows or should know" language from the act without replacing it with another standard, the legislature intended for a strict liability standard to apply. We disagree. First, Frieler points to no specific statutory language articulating such a standard. Moreover, this argument conflicts with legislative history indicating that the 2001 changes to the MHRA were intended to conform the MHRA to federal law.

The Supreme Court, in *Ellerth* and *Faragher*, rejected a strict liability standard for all cases of supervisor harassment. *See Ellerth*, 524 U.S. at 764, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 804–07, 118 S.Ct. 2275. In doing so, the Court explained that adopting an affirmative defense for employers in some circumstances would "encourage employees to report harassing conduct before it becomes severe or pervasive," which "would also serve Title VII's deterrent purpose." *Ellerth*, 524 U.S. at 764, 118 S.Ct. 2257.

We likewise reject Frieler's argument that strict liability is the standard to be applied in sexual harassment cases and instead adopt the standard set forth in *Ellerth* and *Faragher*. First, we agree with the Supreme Court's reasoning and conclude that a strict liability standard in all cases of supervisor harassment would be contrary to the MHRA's express policy of "secur[ing] for persons in this state, freedom from discrimination: (1) in employment because of * * * sex." Minn. Stat. § 363A.02, subd. 1(a) (2006). Furthermore, the MHRA states that "[n]othing in this chapter shall be interpreted as restricting the implementation of positive action programs to combat discrimination." *Id.*, subd. 1(b). Second, in requesting the 2001 amendment, the Minnesota Human Rights Commissioner clarified that, except for cases of quid pro quo harassment, employers would be able to avail themselves of the affirmative defense, as discussed in *Ellerth* and *Faragher*. Hrg. on H.F. 767; Hrg. on S.F. 1215.

Therefore, we adopt the standard set forth by the Supreme Court in *Ellerth* and *Faragher* as the proper one to be applied to claims of workplace supervisor sexual harassment.[8] The Supreme Court in *Ellerth* and *Faragher* used principles from

---

**8.** The dissent asserts that the *Ellerth* and *Faragher* standard should not apply to sexual harassment claims under the MHRA, in part, because the MHRA, unlike Title VII, includes an express definition of "sexual harassment" that distinguishes between quid pro quo harassment and hostile work environment harassment. The dissent contends that the Supreme Court conflated the concepts of these two types of harassment in *Ellerth* and *Faragher* and that this court should not do the same under the MHRA. While the MHRA does define "sexual harassment" in three subparts, one obvious difference that we can see, based simply on the wording of the MHRA, is that the pre–2001 version contained the "knows or should know" language in only the subpart that defined hostile work environment sexual harassment. *See* Minn.Stat. § 363.01, subd. 41(3) (2000). And the legislature removed this language in 2001. Thus, we are not improperly conflating the concepts of these two types of sexual harassment by recognizing the legislature's elimination of this liability standard from the one place it was previously found in the statute and applying the *Ellerth* and *Faragher* standard, which does not contain the eliminated language for hostile work environment sexual harassment claims based on harassment by a supervisor. The dissent also relies heavily on *Chambers v. Trettco, Inc.*, 463 Mich. 297, 614 N.W.2d 910 (2000), in which the Michigan Supreme Court refused to apply the *Ellerth* and *Faragher* standard to the Michigan Civil Rights Act. The Michigan Civil Rights Act, however, never expressly contained the "knows or should know" language in its definition of hostile work environment sexual harassment, and the Michigan Supreme Court was not addressing how its state statute should be interpreted, in light of an express legislative change eliminating such language. *Chambers*, 614 N.W.2d at 914–16; *see also* Mich. Comp. Laws Ann. § 37.2103(i) (West 2001). *Chambers*, therefore, is clearly distinguishable. Finally, the dissent contends the *Ellerth* and *Faragher* standard conflicts with the plain language of

the Restatement of Agency to attribute liability to the employer in cases involving a supervisor's sexual harassment of an employee. *Ellerth,* 524 U.S. at 754, 118 S.Ct. 2257; *see Faragher,* 524 U.S. at 802–03, 118 S.Ct. 2275. It did so because Title VII specifically defines "employer" to include an employer's "agent." *Ellerth,* 524 U.S. at 754, 118 S.Ct. 2257 (citing 42 U.S.C. § 2000e(b) (2000)).

Unlike Title VII, the MHRA does not contain any language using explicit terms of agency. However, the "master-servant" concepts of agency are often used to define "employer" and "employee" terms. For example, Black's Law Dictionary defines "employment" as "[t]he relationship between master and servant." *Black's Law Dictionary* 566 (8th ed. 2004). The version of Black's Law Dictionary in effect at the time the legislature added the term "employee" to the definitions in the MHRA in 1987, *see* Act of May 28, 1987, ch. 282, § 2, 1987 Minn. Laws 1447, 1449 (codified at Minn.Stat. § 363.01, subd. 39 (Supp.1987)), stated that the term "servant" is "synonymous with 'employee.'" *Black's Law Dictionary* 471 (5th ed. 1979). That same edition noted that the term "master and servant" "has generally been replaced by 'employer and employee.'" *Id.* at 879. Also, in defining the term "principal," the edition stated that the term "includes in its meaning the term 'master,' a species of principal who, in addition to other control, has a right to control the physical conduct of the species

of agents known as servants, as to whom special rules are applicable with reference to harm caused by their physical acts." *Id.* at 1073. We also note that the overwhelming majority of employers are artificial entities, such as corporations like CMG in this case, who can act only through their agents. *See Save Our Creeks v. City of Brooklyn Park,* 699 N.W.2d 307, 310 (Minn.2005); *Thomas Oil Co., Inc. v. Onsgaard,* 298 Minn. 465, 469, 215 N.W.2d 793, 796 (1974). As a result, concepts of agency law are an inherent part of the actions of employers.

In addition, we have previously relied upon agency principles in determining whether the knowledge of a supervisor should be imputed to an employer for determining whether the employer knew about incidents of sexual harassment. In *McNabb v. Cub Foods,* we held that "it seems to be a clear legal conclusion" that an employee's knowledge of acts of sexual harassment should be imputed to the employer because the employee was "clothed with supervisory and managerial authority over subordinates," was the employer's "link to" the department in the store where the plaintiff worked, and was used by the employer to assess the performance of that department and the employees within it. 352 N.W.2d 378, 384 (Minn. 1984). We therefore conclude that the Restatement (Second) of Agency § 219 (1957) [hereinafter Restatement], with its use of the terms "master" and "servant," guides our analysis of supervisor liability.[9]

___

the MHRA. We can find no statutory text with which it conflicts, and the dissent has identified no such language.

9. Using the Restatement as our guide is supported by our decision in *City of Minneapolis v. Richardson,* 307 Minn. 80, 92–93, 239 N.W.2d 197, 205 (1976). In that case, the issue before the court was whether to extend the rule authorizing vicarious liability for punitive damages to the city for the racially discriminatory actions of some of its police

officers. *Id.* at 91–92, 239 N.W.2d at 204–05. We considered the Restatement's position on vicarious liability before concluding that extending the rule to supervisors "might comport with the central policy behind vicarious liability in this area—to induce supervisory employees to carefully train, supervise, and discipline their employees." *Id.* at 92–93, 239 N.W.2d at 205.

Although "[t]he general rule is that sexual harassment by a supervisor is not conduct within the scope of employment," *Ellerth*, 524 U.S. at 757, 118 S.Ct. 2257, the Restatement allows other means of employer liability:

> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
>> (a) the master intended the conduct or the consequences, or
>>
>> (b) the master was negligent or reckless, or
>>
>> (c) the conduct violated a non-delegable duty of the master, or
>>
>> (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

Restatement § 219(2). The relevant subpart here is section 219(2)(d), which "concerns vicarious liability for intentional torts committed by an employee when the employee uses apparent authority (the apparent authority standard), or when the employee was aided in accomplishing the tort by the existence of the agency relation." *Ellerth*, 524 U.S. at 759, 118 S.Ct. 2257 (internal quotation marks omitted).

We agree with the Supreme Court that the "proper analysis calls not for a mechanical application of indefinite and malleable factors set forth * * * in the Restatement," but instead should be "an inquiry into the reasons that would support a con-clusion that harassing behavior ought to be held within the scope of a supervisor's employment." *Faragher*, 524 U.S. at 797, 118 S.Ct. 2275. Something more than the mere employment relationship must exist in order to establish the "aided by the agency" principle, such as when a supervisor subjects a subordinate to a significant, tangible employment action. *Ellerth*, 524 U.S. at 760, 118 S.Ct. 2257. Because of the power a supervisor wields over those being supervised, he or she is also aided by the agency relationship in committing sexual harassment that does not culminate in a tangible employment action, and such sexual harassment ought to be held within the scope of the supervisor's employment. As the Supreme Court explained:

> When a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor, whose power to supervise—[which may be] to hire and fire, and to set work schedules and pay rates—does not disappear * * * when he chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of promotion.

*Faragher*, 524 U.S. at 803, 118 S.Ct. 2275 (alteration and omission in original) (internal quotation marks omitted).

As a result, we hold that an employer is subject to vicarious liability for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over a victimized employee.[10] In circumstances when no tangible employment action is

---

**10.** If we were to continue to apply the *Continental Can* standard and hold that a plaintiff still must prove that his or her employer knew or should have known about the harassment but failed to take appropriate action in a case of an actionable hostile environment created by a supervisor even after the 2001 amendment to the definition of "sexual harassment," then this court could easily be accused of writing a liability standard into the MHRA that not only does not exist in the statutory language but that formerly existed in the language and was expressly removed by the legislature. Moreover, in *Continental Can,* when this court adopted this standard for only hostile work environment sexual harassment claims based on coworker harassment, the MHRA did not contain a definition of sexual harassment. *See* Minn.Stat. § 363.01 (1980); *Cont'l Can,* 297 N.W.2d at 249. By all accounts, this court was writing standards into

taken against the employee, the employer may raise an affirmative defense to liability or damages if it proves by a preponderance of the evidence: (1) "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." [11] *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. We also hold, as the Supreme Court did, that an employer may not avail itself of this affirmative defense when the supervisor harassment "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 808, 118 S.Ct. 2275.

the MHRA in *Continental Can*, and those standards were taken from federal law that existed at the time. Thus, to go back to the *Continental Can* standard is to do exactly what the dissent is criticizing this court for doing by adopting the *Ellerth* and *Faragher* standard—engrafting a federal standard for sexual harassment into the MHRA.

11. Of course, a plaintiff still has the burden of proof for proving her sexual harassment claim. Thus, in order to establish a claim of sexual harassment based on a hostile work environment caused by the harassment of a supervisor, a plaintiff must still prove: (1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on membership in a protected group; and (4) the harassment affected a term, condition, or privilege of her employment. *Goins*, 635 N.W.2d at 725. In order to demonstrate that the harassment affected a term, condition, or privilege of employment, a plaintiff will have to show the harassment was "so severe or pervasive" as to "alter the conditions of the [plaintiff's] employment and create an abusive working environment." *Id.* (alteration in original) (internal quotation marks omitted). Therefore, we are not shifting the burden of proof to the employer by holding that an affirmative defense is available for sexual harassment

## IV.

We turn now to the issue of whether Janiak was a supervisor for purposes of Frieler's sexual harassment claim. In *Ellerth* and *Faragher*, the Supreme Court stated that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. In these cases, the Supreme Court, without analyzing the issue, concluded that employees who had the ability to take tangible employment actions, such as hiring and firing, as well as employees who set work schedules and supervised day-to-day work, were supervisors. *See Ellerth*, 524 U.S. at 747, 766, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 781, 808, 118

claims when the alleged harasser is a supervisor. Instead, like any other affirmative defense, in some cases of hostile work environment sexual harassment, if a plaintiff meets her burden of proof and proves her case, a defendant can still avoid liability by establishing the affirmative defense. If this constitutes impermissible burden shifting, then we have endorsed such burden shifting in claims under the MHRA. For example, assume the following facts in a case of gender discrimination: a plaintiff does not receive a position and the person making the hiring decision states in his deposition that the plaintiff did not receive the position because he did not think a woman could do the job. In this situation, we would presume liability on behalf of the employer because the plaintiff had shown an illegal, discriminatory motive influenced the hiring decision. *See Goins*, 635 N.W.2d at 722–23 (discussing how a plaintiff could establish a case of disparate impact discrimination with direct evidence of a discriminatory motive). This plaintiff would not need to show additional facts, such as that someone else at the company knew about this discriminatory motive and approved it, in order to hold her employer liable under the MHRA.

S.Ct. 2275. The Supreme Court, however, did not adopt a definition of a "supervisor," and there is no federal consensus regarding what authority an employee has to have in order to be considered a supervisor under the *Ellerth/Faragher* liability standard.

Some courts have taken a narrower view of this issue. For example, the Eighth Circuit has stated that "to be considered a supervisor, the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties." *Weyers v. Lear Operations Corp.*, 359 F.3d 1049, 1057 (8th Cir. 2004) (internal quotation marks omitted); *see also Howard v. Winter*, 446 F.3d 559, 566 (4th Cir.2006) (holding that employee was not a supervisor for purposes of sexual harassment claim under Title VII because he had no power to take a tangible employment action and his authority over the plaintiff consisted of occasional authority to direct her daily operational duties); *Noviello v. City of Boston*, 398 F.3d 76, 95 (1st Cir.2005) (holding that to be a supervisor, employee had to have the power to take tangible employment action against plaintiff and that the authority to oversee the plaintiff's work was not sufficient).[12]

The Equal Employment Opportunity Commission (EEOC) has taken a more expansive view of who is a supervisor for purposes of sexual harassment under Title VII. Under the EEOC definition, an individual qualifies as an employee's supervisor if "the individual has authority to undertake or recommend tangible employment decisions affecting the employee; *or*

* * * the individual has authority to direct the employee's daily work activities." EEOC, Notice No. 915.002 (June 18, 1999), http://www.eeoc.gov/policy/docs/harassment.html. According to the EEOC, an employee should be considered a supervisor even if he or she does not have the final say in making tangible employment decisions if "the individual's recommendation is given substantial weight by the final decisionmaker(s)." *Id.* In addition, "an individual's ability to commit harassment is enhanced by his or her authority to increase the employee's workload or assign undesirable tasks, and hence it is appropriate to consider such a person a 'supervisor' when determining whether the employer is vicariously liable." *Id.*

Several courts have either adopted the EEOC's definition or relied on it in upholding a broader definition of a supervisor for sexual harassment claims under Title VII. *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 125–27 (2d Cir.2003) (relying on the EEOC's definition and ruling that an employee is a supervisor if "the power— economic *or otherwise*, of the harassing employee over the subordinate victim given by the employer to the harasser—enabled the harasser, or materially augmented his or her ability, to create or maintain the hostile work environment" and finding that an employee can be a supervisor by directing the day-to-day work of another employee); *Hayes v. Laroy Thomas, Inc.*, No. 5:05CV195, 2007 WL 128287, at *16 (E.D.Tex. Jan. 11, 2007) (adopting a modified version of the EEOC definition and holding that to be a supervisor, "[t]he au-

---

**12.** The Seventh Circuit initially took such a narrow view of the definition of a "supervisor." *See, e.g., Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir.2002). The Seventh Circuit, however, has started to back away from such a narrow definition of a "supervisor." In *Phelan v. Cook County*, the Seventh Circuit found that two employees could be considered supervisors because they played a substantial role in taking tangible employment actions against the plaintiff, even if they did not wield the ultimate authority to take the final, tangible employment action. 463 F.3d 773, 783–84 (7th Cir.2006).

thority entrusted in a supervisory employee need not be plenary or absolute, but it must encompass, in some significant way, the power to initiate, recommend, or effect tangible employment actions affecting the economic livelihood of the supervisor's subordinates"); *Dinkins v. Charoen Pokphand USA, Inc.,* 133 F.Supp.2d 1254, 1266 (M.D.Ala.2001) (adopting the EEOC's definition of supervisor for sexual harassment claim under Title VII); *Kent v. Henderson,* 77 F.Supp.2d 628, 633 (E.D.Pa.1999) (same).

We conclude that the EEOC definition should be used for determining whether a person is a supervisor for purposes of sexual harassment claims under the MHRA. We adopt this definition of "supervisor" because we have consistently held that the remedial nature of the Minnesota Human Rights Act requires liberal construction of its terms. *See Cummings v. Koehnen,* 568 N.W.2d 418, 422 (Minn.1997); *see also* Minn.Stat. § 363A.04 (2006) ("The provisions of [the MHRA] shall be construed liberally for the accomplishment of the purposes thereof."). We also agree with the criticism leveled by other courts that the narrower definition of "supervisor" is a "simplistic taxonomy" that ignores the reality of the modern-day workplace, where individuals are often given significant power over other employees, even if another employee has "final" decision-making authority when it comes to issues like hiring, firing, and setting wages. *See Mack,* 326 F.3d at 126 (rejecting narrower definition of "supervisor" because in *Ellerth* and *Faragher,* the Supreme Court was concerned not just with tangible employment actions but instead focused on whether the authority given by an employer to a particular employee enabled him or her to create a hostile working environment); *Dinkins,* 133 F.Supp.2d at 1266 (rejecting narrow definition of "supervisor" because it "improperly truncate[d] the Supreme Court's holdings in

*Faragher* and *Ellerth,*" and because these cases indicate "analysis of employment relationships involves multifactorial analysis rather than simplistic taxonomy"); *see also Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 509–10 (7th Cir.2004) (Rovner, J., concurring) (stating that the Seventh Circuit has taken too narrow a view of the definition of "supervisor" that "does not comport with the realities of the workplace" by excluding from the definition employees who have substantial authority over a plaintiff's day-to-day work life, and calling for the court to reexamine the criteria articulated for identifying supervisors).

The record in this case, when viewed in a light most favorable to Frieler, provides the following evidence as to Janiak's supervisory authority. First, Janiak was the supervisor in the shipping department, and Frieler applied for an open position in that department. When Frieler inquired about the open position in the shipping department, she was told by Weber, who was Janiak's supervisor and Frieler's supervisor in her position in the bindery department, to talk to Janiak about the position. When she talked to Janiak, he told her that he would consider her for the position. Second, Janiak and Weber both interviewed Frieler for the position. Third, there is evidence that the decision to offer the position to Frieler was a group decision made by Weber, Janiak, and Krob and not a decision that only Weber and/or Krob made. Krob, who is Weber's supervisor, testified that the decision to hire Frieler for the shipping department position was made "as part of discussion in terms of Ed [Janiak], David [Weber], with input from myself." Fourth, Janiak was given the authority to determine whether attendance issues Frieler had would interfere with the duties of the shipping department position. Janiak testified he and Weber told Frieler that if she

wanted the position, she could not miss any work in the next two weeks. Janiak then monitored her attendance, and after Frieler missed several days of work during this period, Janiak went to Weber to talk to him about this concern. Weber then told Janiak to talk to Frieler about her absences, which Janiak did. Finally, Janiak used his position as the shipping department supervisor to bring Frieler to the limited-access room where the alleged sexual harassment took place, by indicating to her that he had to show her tasks related to the open shipping department position. All of the acts of alleged sexual harassment occurred while Frieler was being considered for the open position in the shipping department.

Based on these facts, we conclude that a reasonable trier of fact could conclude that Janiak had the authority to undertake or recommend the tangible employment decision of hiring Frieler for the opening in the department that he supervised.[13] And even if Janiak did not have the final say in making this tangible employment decision, a reasonable trier of fact could determine that Janiak's recommendation to hire Frieler for the open position in his department was given substantial weight by the final decisionmaker(s), Weber and/or Krob. Therefore, we conclude that genuine issues

of material fact exist regarding whether Janiak was, in fact, a supervisor.

Having identified the correct standard to be applied after the 2001 amendments to the MHRA for sexual harassment allegedly committed by a supervisor and concluded there are genuine issues of material fact as to Janiak's supervisory status, we reverse the court of appeals and remand for further proceedings on this claim.

V.

Finally, we are asked to determine whether summary judgment was properly granted on Frielers assault and battery claim. The court finds that Frieler did not create a genuine issue of material fact with respect to whether Janiak's actions were foreseeable, and, as a result, affirms the grant of summary judgment to CMG on this claim. I respectfully dissent.

Frieler attempts to hold CMG liable for Janiak's torts under the theory of respondeat superior. Under that theory, "an employer is vicariously liable for the torts of an employee committed within the course and scope of employment." *Schneider v. Buckman,* 433 N.W.2d 98, 101 (Minn.1988). Liability stems, not from the fault of the employer, but from notions of public policy that an employer should have to bear liability for acts committed by its employees

---

**13.** Even if we adopted a narrower definition of "supervisor," we would still conclude that under the facts of this case a reasonable fact-finder could determine that Janiak was a supervisor. The evidence, when viewed in a light most favorable to Frieler, supports the conclusion that Janiak had more than "input" into the decision to hire Frieler for the opening in the department that he managed, and that, instead, he and Weber made this decision together. *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 154–55 (3d Cir.1999) (holding that employee was supervisor for purposes of sexual harassment claim when employee was part of a three-person group that instructed the plaintiff's direct supervisor to fire her). In

addition, a reasonable fact-finder could conclude that Janiak was a supervisor because Frieler reasonably thought that he had decision-making authority to hire for the open position in the shipping department, based on apparent authority created by CMG. *Ellerth,* 524 U.S. at 759, 118 S.Ct. 2257 (stating that a claim for supervisor harassment can be based on apparent authority if the victim has the mistaken belief that an employee is a supervisor, as long as that belief is reasonable). The facts here reveal Weber told Frieler to talk to Janiak about the open position, let Janiak sit in on the interview, and then had Janiak follow up with Frieler about her attendance issues.

within the scope of their employment as a cost of doing business. *See Lange v. Nat'l Biscuit Co.*, 297 Minn. 399, 403, 211 N.W.2d 783, 785 (1973).

"[A]n employee's act need not be committed in furtherance of his employer's business to fall within the scope of his employment" for purposes of respondeat superior. *Fahrendorff v. N. Homes, Inc.*, 597 N.W.2d 905, 910 (Minn.1999). Instead,

[t]he master is liable for any such act of the servant which, if isolated, would not be imputable to the master, but which is *so connected with and immediately grows out of another act of the servant imputable to the master*, that both acts are treated as one indivisible tort.

*Lange*, 297 Minn. at 404, 211 N.W.2d at 785–86 (emphasis added) (internal quotation marks omitted). An employer can be responsible for the sexual misconduct and sexual assaults of its employees, even when such conduct was illegal or expressly prohibited by the employer, under respondeat superior. *Fahrendorff*, 597 N.W.2d at 912 (holding that group home operator could be liable for sexual assault of resident by program counselor under respondeat superior); *Marston v. Minneapolis Clinic of Psychiatry & Neurology, Ltd.*, 329 N.W.2d 306, 311 (Minn.1982) (holding that clinic could be liable for sexual acts committed by psychologist during therapy sessions under respondeat superior).

In order for an employer to be liable for the torts of an employee that are outside the scope of his or her employment under respondeat superior, a plaintiff must show, in part, that such conduct was foreseeable. *Fahrendorff*, 597 N.W.2d at 911 (noting that relevant factors in this inquiry are whether the "employee's acts were foreseeable, related to, and connected with acts otherwise within the scope of * * * employment"). Foreseeability for purposes of respondeat superior "merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Id.* at 912 (internal quotation marks omitted).

I disagree with the court's conclusion that Frieler was required to present evidence that Janiak's sexual harassment was foreseeable. The issue of whether sexual harassment by supervisors is foreseeable is unique in one important aspect. Unfortunately, it is well known and well documented that sexual harassment is a common, pervasive problem in American workplaces.[14] In fact, ten years ago in *Faragher*, the Supreme Court found that

---

**14.** Numerous studies have documented the prevalence of sexual harassment in the workplace. *See* Barbara Lindemann & David D. Kadue, *Sexual Harassment in Employment Law* 4–5 (1992) (discussing studies showing prevalence of sexual harassment). One of the most often-cited studies was a survey of thousands of federal employees conducted by the Merit Systems Protection Board in 1980 and updated in 1987 and 1994. U.S. Merit Sys. Prot. Bd., *Sexual Harassment in the Federal Workplace* 1–2 (1995). The results of the survey in all three years were similar. *Id.* at 58. In 1994, 44% of female respondents and 19% of male respondents said they had experienced sexually harassing behavior at work in the previous two years. *Id.* at vii. The most

common form of harassment was sexual remarks, jokes, and teasing, with 37% of women and 14% of men saying they had been subjected to such behavior. *Id.* at viii. However, more serious forms of harassment were also very common. Nearly a quarter of women, 24%, and 8% of men indicated they had been subjected to deliberate touching of a sexual nature, and 7% of women and 2% of men said they had been pressured for sexual favors. *Id.* at 58. In 2007, approximately 12,500 charges were filed with the EEOC alleging sexual harassment. EEOC, Sexual Harassment Charges, EEOC & FEPAs Combined, FY 1997–FY 2007, http://www.eeoc.gov/stats/harass.html (last visited May 27, 2008).

"[i]t is by now well recognized that hostile environment sexual harassment by supervisors (and, for that matter, coemployees) is a persistent problem in the workplace." 524 U.S. at 798, 118 S.Ct. 2275. As a result, for purposes of holding employers liable under respondeat superior for the torts committed by supervisors who engage in sexual harassment, I would not require a plaintiff to produce evidence that the sexual harassment was foreseeable. Instead, I would find that such conduct is foreseeable as a matter of law.

Notions of public policy and fairness underlie respondeat superior. In previous respondeat superior cases, the level of evidence showing the foreseeability of the sexual misconduct of employees that this court has found sufficient to withstand a motion for summary judgment has been quite low. *See Fahrendorff*, 597 N.W.2d at 911–12 (finding sufficient evidence that sexual abuse is a well-known hazard at group homes based on conclusory statement in affidavit of expert to that effect). When this low threshold is considered, along with the fact that the prevalence of sexual harassment in American workplaces is well recognized, I do not think that notions of public policy and fairness require a plaintiff in these circumstances to hire an expert to testify that sexual harassment is a well-known hazard. Requiring such testimony in this unique situation would place form over substance and simply lead to plaintiffs being forced to spend money on experts who would then state what is, in essence, common knowledge.

I also do not believe that such a ruling will cause employers to become liable for every sexual assault committed in the workplace. In order to prevail on a claim of respondeat superior for an assault committed by an employee against another employee, a plaintiff also has to prove the assault was "related to and connected with acts otherwise within the scope of" the employment of the employee committing the assault. *Id.* at 911. Thus, employers will not be strictly liable for every sexual assault that occurs in the workplace.

Because I would not require Frieler to present evidence that Janiak's sexual harassment was foreseeable in order for CMG to be liable for the assault and battery committed by Janiak under respondeat superior, I would reverse the court of appeals on this issue and remand for further proceedings.

### OPINION AND DISSENT[15]

GILDEA, Justice.

Appellant Judy Frieler claims that her former employer—Carlson Marketing Group, Inc. (CMG)—is liable for both hostile environment harassment under the Minnesota Human Rights Act (MHRA) and common law assault and battery. I conclude that summary judgment was properly entered in favor of CMG on both claims.

### I.

We are first asked to address employer liability for hostile environment harassment under the MHRA. In *Continental Can Co. v. State*, 297 N.W.2d 241, 249 (Minn.1980), we held that an employer could be liable for hostile environment discrimination under the MHRA "when the employer knew or should have known of the employees' conduct alleged to constitute sexual harassment and fails to take timely and appropriate action." The legislature subsequently wrote this "knows or

---

**15.** Part II of this opinion is the opinion of the court with respect to the common law assault and battery claim.

should know" standard into the statutory definition of hostile environment harassment in the MHRA. Act of Mar. 23, 1982, ch. 619, § 3, 1982 Minn. Laws 1508, 1511 (codified at Minn.Stat. § 363.01, subd. 10a (1982)). And, as the majority acknowledges, we reaffirmed this standard recently in *Goins v. West Group*, 635 N.W.2d 717, 725 (Minn.2001).

In 2001, however, the legislature deleted the "knows or should know" language from the definition of hostile environment harassment. Act of May 24, 2001, ch. 194, § 1, 2001 Minn. Laws 723, 724 (amending Minn.Stat. § 363.01, subd. 41(3) (Supp. 2001), recodified at Minn.Stat. § 363A.03, subd. 43 (2006)). The majority concludes that this legislative change compels us to depart from nearly 30 years of precedent governing employer liability for hostile environment sexual harassment in the workplace. I disagree for two reasons and respectfully dissent.

First, in my view, it is not clear from either the plain text of the statute or the legislative history that, by deleting the "knows or should know" standard from the definition of sexual harassment, the legislature intended to adopt the federal standard of employer liability set forth by the United States Supreme Court in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Second, in the absence of a clear legislative intent, I would not engraft the federal standard onto the MHRA because application of that standard is not consistent with other clear provisions of the MHRA or with Minnesota common law. If the legislature intends to make the federal standard apply, further amendment of the MHRA would be necessary, and in my view such amendment is not within the purview of this court. *See Annandale Advocate v. City of*

*Annandale*, 435 N.W.2d 24, 34 (Minn.1989) (explaining our attempt to interpret the applicable statutes "without judicial legislation" and stating that "[i]f the legislature feels that we have failed to interpret its motives properly, then it must clarify [the] statutes").

1. *The Legislative History Is Ambiguous as to What Standard Should Be Applied.*

The majority concludes that the legislature's "clear intent" in removing the "knows or should know" language from the MHRA definition of sexual harassment was to impose liability on employers for supervisor sexual harassment based on the standard articulated in *Ellerth* and *Faragher*. In these cases, the Supreme Court adopted what it termed "the more stringent standard of vicarious liability," *Ellerth*, 524 U.S. at 759, 118 S.Ct. 2257, and held that an employer may be vicariously liable under federal law for the harassing conduct of a supervisor: "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id.* at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. Such liability attaches to the employer not because of its own behavior, but rather because the supervisor is the employer's agent in the workplace and because the supervisor is aided in accomplishing the harassment by this agency relationship. *Ellerth*, 524 U.S. at 760, 118 S.Ct. 2257; *see also Faragher*, 524 U.S. at 802, 118 S.Ct. 2275. This new "stringent" standard is the standard the majority today engrafts onto the MHRA.

But the statutory text of the MHRA does not contain any language that can reasonably be construed as adopting the federal *Ellerth/Faragher* standard. The

majority attempts to avoid this omission from the statutory text by focusing on the legislative history associated with the amendment to the definition of sexual harassment. As Justice Robert Jackson noted, however, resorting to legislative history can present an interesting challenge for the judiciary:

> When we decide from legislative history, including statements of witnesses at hearings, what Congress probably had in mind, we must put ourselves in the place of a majority of Congressmen and act according to the impression we think this history should have made on them. Never having been a Congressman, I am handicapped in that weird endeavor. That process seems to me not interpretation of a statute but creation of a statute.

*United States v. Pub. Util. Comm'n of Cal.*, 345 U.S. 295, 319, 73 S.Ct. 706, 97 L.Ed. 1020 (1953) (Jackson, J., concurring).

This challenge is made greater in the present case because the legislative history the majority cites is contradictory. *See S. Minn. Beet Sugar Coop. v. County of Renville*, 737 N.W.2d 545, 553 n. 3 (Minn.2007) (declining to rely on "unclear" legislative history in construing statute). Specifically, the majority cites the testimony from the Commissioner of Human Rights. *See* Hearing on H.F. 767, H. Comm. Civil Law, 82d Minn. Leg., Feb. 26, 2001 [hereinafter Hrg. on H.F. 767] (audio tape) (comments of Janeen Rosas, Minn. Comm'r of Human Rights); Hearing on S.F. 1215, S. Judiciary Comm., 82d Minn. Leg., Apr. 3, 2001 [hereinafter Hrg. on S.F. 1215] (audio tape) (same). But the Commissioner's

comments are contradictory. On the one hand, the Commissioner argued that deletion of the "knows or should know" language was necessary to bring the MHRA into conformity with federal law. Hrg. on H.F. 767; Hrg. on S.F. 1215. But on the other hand, the Commissioner, when specifically asked whether the legislature should write the federal standard into the text of the statute, advised the legislature not to do so. The Commissioner opined that because sexual harassment involves "a very complicated area of the law and with all the nuisances [sic] in various cases[, it is] better addressed through case law as opposed to statute." Hrg. on S.F. 1215. I cannot read this contradictory testimony as expressing a "clear intent" by the legislature that the *Ellerth/Faragher* standard applies to hostile environment claims under the MHRA.[16]

While the amendment deleted the "knows or should know" language from the statute, it did not expressly replace this standard with the federal *Ellerth/Faragher* standard; indeed, the amended statute is silent as to any standard of vicarious liability for sexual harassment. In my view, the only thing to be gleaned from the 2001 amendment is that the legislature intended for the judiciary to determine the standard to be applied.

### 2. The Federal Standard Is Not Consistent with the Text of the MHRA or Minnesota Common Law.

The question then becomes what standard should govern employer liability for hostile environment harassment. The majority reverts to the *Ellerth/Faragher* standard. Because that standard is based

---

16. Moreover, in my view, the majority's deference to the Commissioner's statements during the legislative hearings is misplaced. Although we may give deference to "an agency's *interpretation* of the statutes it administers" when those statutes are ambiguous, *Geo.*

*A. Hormel & Co. v. Asper*, 428 N.W.2d 47, 50 (Minn.1988) (emphasis added), the statements here are not an interpretation of a statute, but rather testimony advocating a change in those statutes.

on the federal statute, which is different in two fundamental respects from the MHRA, I disagree with the majority's conclusion to engraft that standard onto the MHRA. We have already indicated that we will depart from federal law interpreting Title VII when the provisions in the federal statute are different from those contained in the MHRA. *Cummings v. Koehnen,* 568 N.W.2d 418, 422 n. 5 (Minn.1997) (declining "to follow the federal rule here because the MHRA is not similar to Title VII in its treatment of sexual harassment"). I would follow the same principle in this case.

To see the inconsistency between the federal and state statutes, we need look no further than the language of the statutes. The MHRA provides that an employer commits "an unfair employment practice" by "discriminat[ing] against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" based on a number of personal characteristics, including the person's sex, Minn.Stat. § 363A.08, subd. 2 (2006), and provides that discrimination based on sex includes sexual harassment, Minn.Stat. § 363A.03, subd. 13 (2006). Most importantly for purposes of this case, the statute defines the term "employer" to mean "a person who has one or more employees." Minn.Stat. § 363A.03, subd. 16 (2006).

In contrast to the MHRA, Title VII of the Civil Rights Act of 1964, defines "employer" to include the employer's "agents." 42 U.S.C. § 2000e(b) (2000). Through this definition, Congress "directed federal courts to interpret Title VII based on agency principles," and the *Ellerth/Faragher* standard is built entirely on these agency principles. *Ellerth,* 524 U.S. at 754–55, 118 S.Ct. 2257 (relying "on the general common law of agency * * * pursuant to congressional direction" in establishing a new "uniform and predictable standard" for sexual harassment discrimination under Title VII). There is no similar legislative directive in the MHRA because the MHRA's definition of employer does not include the employer's agents. *See* Minn.Stat. § 363A.03, subd. 16; *see also* 17 Stephen F. Befort, *Minnesota Practice—Employment Law & Practice* § 9.14 (2d ed. 2003) ("The Act defines an employer as 'a person who has one or more employees.' As such, it does not appear to include supervisors or other agents of the employer to the extent that they are acting on its behalf." (footnote omitted)). If, as the majority finds, the legislature intended the federal standard to apply to the MHRA, the legislature should have amended the definition of employer. But the legislature did not make this change, and this court is without authority to do so.

The second material difference between the MHRA and the federal law is found in the definition of sexual harassment itself. The MHRA defines "sexual harassment" as follows:

> "Sexual harassment" includes unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature when:
>
> (1) submission to that conduct or communication is made a term or condition, either explicitly or implicitly, of obtaining employment, public accommodations or public services, education, or housing;
>
> (2) submission to or rejection of that conduct or communication by an individual is used as a factor in decisions affecting that individual's employment, public accommodations or public services, education, or housing; or
>
> (3) that conduct or communication has the purpose or effect of substantially interfering with an individual's employ-

ment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment.

Minn.Stat. § 363A.03, subd. 43. The first two subparts of this definition are generally referred to as "quid pro quo" harassment, while the third is referred to as "hostile environment" harassment. The MHRA thus distinguishes between separate forms of actionable sexual harassment.

The federal statute, however, does not expressly define or prohibit sexual harassment; instead, federal courts have construed the general prohibition of discrimination based on sex to include sexual harassment. *See, e.g., Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 63–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). And in *Ellerth* and *Faragher,* the Court "conflate[d]" the concepts of quid pro quo and hostile environment sexual harassment. *Chambers v. Trettco, Inc.,* 463 Mich. 297, 614 N.W.2d 910, 917 (2000). Applying the federal standard therefore amounts to a rewrite of the MHRA insofar as the federal standard conflates what the MHRA defines as two separate forms of harassment. Such a revision of the statute is beyond the purview of the judicial branch.

The Michigan Supreme Court noted this problem in declining to engraft the federal standard onto its state's anti-discrimination law. Like our statute, Michigan's Civil Rights Act includes sexual harassment in the definition of sex discrimination, and the Michigan statute adopts the same two-part definition of "sexual harassment" as the Minnesota law. *See* Mich. Comp. Laws § 37.2103(i) (West 2001) (defining sexual harassment as both quid pro quo and hostile environment harassment). In *Chambers v. Trettco, Inc.,* the Michigan Supreme Court considered whether the

*Ellerth/Faragher* standard should apply under the Michigan statute. 614 N.W.2d at 912. The court rejected the federal standard, concluding that *Ellerth* and *Faragher* "conflate the concepts of quid pro quo harassment and hostile environment harassment," which the court found to be "expressly" included in the state statute's definition of sexual harassment. *Id.* at 917. The court concluded that its "limited role in interpreting statutes would preclude" it "from essentially legislating" the *Ellerth/Faragher* standard into the state statute, "[e]ven if [the court] thought it sound policy to blur the distinctions between these types of sexual harassment in order to announce a common rule on vicarious liability that encompasses all sexual harassment." *Id.* (internal quotation marks omitted); *see also McClements v. Ford Motor Co.,* 473 Mich. 373, 702 N.W.2d 166, 175 n. 14 (2005) (reaffirming *Chambers* and "declin[ing] to strictly impose vicarious liability in sexually hostile work environment cases, absent an awareness by the employer of the offensive conduct").

The Michigan Supreme Court also rejected the invitation to write the federal standard into its state law because the federal standard "shift[s] the burden of proof from the employee to the employer regarding whether the employer should be held vicariously liable" for supervisor hostile environment sexual harassment. *Chambers,* 614 N.W.2d at 917. The court found no basis in the Michigan statute "for singling out sexual harassment cases, as opposed to other classes of prohibited discrimination" for "imposing upon defendants the burden of affirmatively disproving vicarious liability." *Id.* at 918.

I come to the same conclusion as the Michigan Supreme Court with respect to engrafting the federal standard onto the MHRA. Like the Michigan statute, the

MHRA identifies two separate forms of actionable sexual harassment, and it is not for this court to collapse these distinct concepts. And like the Michigan Supreme Court, we have recognized that the plaintiff bears the burden of proof in a claim brought for violation of the MHRA. *E.g., Hoover v. Norwest Private Mortgage Banking,* 632 N.W.2d 534, 542 (Minn.2001) (discussing plaintiff's burden to prove discriminatory discharge claim under the MHRA). There is no basis in the text of the MHRA for shifting the burden to the employer in the context of hostile environment harassment as application of the federal standard would do. *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257 (holding that employer is liable for hostile environment harassment unless employer proves by preponderance of the evidence the two prongs of the affirmative defense).[17] In sum, in my view there is no basis in the text of the statute for this court to engraft the federal standard onto the MHRA.

The conclusion that this court ought not to adopt the federal standard is reinforced by Minnesota's common law principles of agency, which in my view are not consistent with the federal *Ellerth/Faragher* standard. In *Ellerth* and *Faragher,* the Supreme Court specifically relied on the Restatement (Second) of Agency § 219(2)(d) (1957), which provides that a master may be liable for the torts of his servant, even if the servant's conduct is outside the scope of his employment, if "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." *See Ellerth,* 524 U.S. at 758, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 801–03, 118 S.Ct. 2275.

The majority asserts that reliance on section 219 of the Restatement to "guide[ ] [the] analysis of supervisor liability" is supported by our decision in *City of Minneapolis v. Richardson,* 307 Minn. 80, 92–93, 239 N.W.2d 197, 205 (1976), because "[w]e considered the Restatement's position on vicarious liability" in our analysis of that case. But *Richardson* addressed a completely different section of the Restatement, and our "consideration" of the Restatement in that case consisted of citing it as representative of an alternative rule to the one we adopted. *Id.* at 92 n. 14, 239 N.W.2d at 205 n. 14. Although we have clearly considered the Restatement (Second) of Agency in other cases addressing Minnesota's common law of agency, *see, e.g., Rosenberg v. Heritage Renovations, LLC,* 685 N.W.2d 320, 331 (Minn.2004), we have never adopted section 219(2) of the Restatement. Thus, our common law of agency has not previously included the central rule from which the Supreme

17. The majority asserts that it is not shifting the burden of proof to the employer by adopting the federal *Ellerth/Faragher* standard because "a plaintiff must still prove: (1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on membership in a protected group; and (4) the harassment affected a term, condition, or privilege of her employment." Although the plaintiff is thus still required to prove that harassment has occurred, our existing law also requires the plaintiff to establish a basis for holding the employer liable for that harassment. Under the federal standard, however, employer lia-bility for the harassment is presumed unless the employer establishes the affirmative defense. This is the burden that is shifted under the federal standard and, as was the case in Michigan, so too does this represent a departure from existing discrimination law in Minnesota. The majority cites *Goins* as an example of where it contends "we have endorsed such burden shifting in claims under the MHRA." But the example cited does not involve hostile environment harassment. Thus, this example is not apposite to the burden shifting problem created by the federal standard in cases of hostile environment harassment.

Court derived the *Ellerth/Faragher* standard.

For the foregoing reasons, I conclude that the judicial branch should not write the federal *Ellerth/Faragher* standard imposing vicarious liability on employers for hostile environment harassment into our state law. I would instead follow the rule we announced nearly 30 years ago in *Continental Can* and hold that where an employer knows or should know of sexually harassing conduct and fails to stop it, the employer is itself negligent and may be held liable for that negligence under the MHRA.[18] *See Continental Can,* 297 N.W.2d at 249 ("[T]he Act does not impose a duty on the employer to maintain a pristine working environment. Rather, it imposes a duty on the employer to take prompt and appropriate action when it knows or should know of co-employees' conduct in the workplace amounting to sexual harassment.").

Applying this liability standard to Frieler's hostile work environment claim,[19] it is undisputed that CMG had no information from which it could be said that CMG knew or should have known about Janiak's misconduct. Frieler did not report Janiak's alleged harassing conduct to CMG until March 10, 2005—2 weeks after the initial incident and after she had already orally accepted the new position. Upon learning of her allegations, CMG immediately initiated an investigation and took steps to ensure that Frieler would not be subjected to further harassment. Based on this record, I conclude that no reason-able trier of fact could conclude that CMG knew or should have known of the alleged harassment in this case. Accordingly, I would affirm the district court's entry of summary judgment.

II.

We are also asked to determine whether summary judgment was properly granted on Frielers assault and battery claim. The court of appeals found that Frieler did not create a genuine issue of material fact with respect to whether Janiak's actions were foreseeable. *Frieler v. Carlson Mktg. Group, Inc.,* No. A06–1693, 2007 WL 2107300, at *7 (Minn.App. July 24, 2007). The court of appeals held that Frieler was required to present expert testimony that sexual harassment is a well-known hazard in her particular industry, but she failed to do so. *Id.*

Frieler attempts to hold CMG liable for Janiak's torts under the theory of respondeat superior, and she argues that the court of appeals erroneously concluded that she needed to use expert testimony to establish that sexual harassment was foreseeable in her industry. According to Frieler, evidence of foreseeability is not necessary in cases in which the employer has knowledge that sexual harassment is a foreseeable risk or "when conduct becomes well known." CMG contends that Frieler presented no evidence demonstrating that sexual harassment is a "well-known hazard" either in the warehouse/bindery industry or any other industry.

---

18. The majority suggests that to continue to apply the standard we adopted in *Continental Can* is to engraft a liability standard onto the MHRA. But there is a significant difference between my application of a standard that is consistent with both the statutory text and our existing precedent, and the majority's adoption of a new standard that is inconsistent with the plain language of the statute, dramatically changes the long-standing policy of this state, and represents a departure from precedent.

19. Frieler's complaint stated only a claim for hostile work environment harassment under the MHRA. I therefore decline to consider whether there could be an issue of material fact with respect to a quid pro quo harassment claim based on this factual record.

■ Under the doctrine of respondeat superior, "an employer is vicariously liable for the torts of an employee committed within the course and scope of employment." *Schneider v. Buckman*, 433 N.W.2d 98, 101 (Minn.1988). But "an employee's act need not be committed in furtherance of his employer's business to fall within the scope of his employment" for purposes of respondeat superior. *Fahrendorff v. N. Homes, Inc.*, 597 N.W.2d 905, 910 (Minn.1999). We have held that an employer is liable for an employee's intentional misconduct if "(1) 'the source of the [tort] is related to the duties of the employee,' and (2) 'the [tort] occurs within work-related limits of time and place.'" *Id.* (quoting *Lange v. Nat'l Biscuit Co.*, 297 Minn. 399, 404, 211 N.W.2d 783, 786 (1973)).

■ In determining whether an employee's intentional misconduct is within the scope of employment, the employee's acts must be "foreseeable, related to and connected with acts otherwise within the scope of employment." *Id.* Whether an employee's acts are foreseeable is a question of fact. *Id.*; *Marston v. Minneapolis Clinic of Psychiatry & Neurology, Ltd.*, 329 N.W.2d 306, 311 (Minn.1982).

In this case, the parties dispute only one aspect of this scope of employment analysis—whether Janiak's alleged assault and battery of Frieler was sufficiently foreseeable that public policy considerations support allocating the costs associated with such misconduct to CMG. *See Fahrendorff*, 597 N.W.2d at 910 (noting that respondeat superior liability is not based on "any fault of the employer," but instead arises "from a public policy determination that liability for acts committed within the scope of employment should be allocated to the employer as a cost of engaging in that business").

■ Our cases clearly hold that a plaintiff must present some evidence that an employee's sexual misconduct was foreseeable to survive summary judgment on a claim of respondeat superior liability for an intentional tort. In *Marston*, we held that a doctor's sexual acts with a patient during therapy sessions were not, as a matter of law, outside the scope of the doctor's employment because testimony was presented "that sexual relations between a psychologist and a patient is a well-known hazard and thus, to a degree, foreseeable and a risk of employment." 329 N.W.2d at 311. Similarly, in *Fahrendorff*, we reversed the district court's entry of summary judgment for the employer, a group home for minor children, after concluding that an expert affidavit "expressly stating that 'inappropriate sexual contact or abuse of power in [group home] situations, although infrequent, is a *well known hazard in this field*'" was "sufficient to raise a question of fact on the foreseeability of sexual abuse in the group home industry." 597 N.W.2d at 911–12 (alteration in original). On the other hand, we held in *P.L. v. Aubert*, 545 N.W.2d 666, 668 (Minn.1996), that there was no factual issue with respect to whether a teacher's sexual relations with a student were within the scope of her employment because the plaintiff failed to present evidence "that such relationships between teacher and student are a 'well-known hazard'; thus foreseeability is absent."

■ Frieler asks us to rule, in essence, that sexual harassment is "foreseeable as a matter of law" because sexual harassment is a common problem in American workplaces. While we recognize that courts, including the Supreme Court, have acknowledged that sexual harassment is, unfortunately, a prevalent problem, *see Faragher*, 524 U.S. at 798, 118 S.Ct. 2275, we are not willing to reverse our long-standing precedent that for purposes of respondeat superior, the foreseeability of an em-

ployee's conduct is a question of fact to be analyzed based on the evidence presented in the particular case.[20] *See Fahrendorff,* 597 N.W.2d at 910; *Aubert,* 545 N.W.2d at 668; *Marston,* 329 N.W.2d at 311. Frieler has not cited, and we cannot find, a single case in which a court has held intentional torts committed by an employee in the course of his or her sexual harassment of another employee to be foreseeable as a matter of law for purposes of holding an employer liable under the doctrine of respondeat superior. We decline Frieler's invitation to adopt such a sweeping rule.

■ We instead adhere to our precedent and hold that the rule that we previously applied in *Marston, Aubert,* and *Fahrendorff* applies to a claim that an employer is liable for the intentional torts committed by one of its employees during his or her sexual harassment of another employee. Under this rule, to survive summary judgment on a claim that an employer is liable for an employee's intentional tort under the doctrine of respondeat superior, the plaintiff must present sufficient evidence to raise an issue of fact with respect to the foreseeability of such misconduct by the employee.

■ In this case, Frieler did not present sufficient evidence on which a reasonable jury could conclude that Janiak's alleged assault and battery was foreseeable. Frieler argues that evidence that an employer has a sexual harassment policy is sufficient to raise a factual dispute with respect to the foreseeability of sexual harassment in the workplace. But courts have recognized that employers should be encouraged as a matter of public policy to implement policies to prevent and address harassment in the workplace. *See, e.g., Ellerth,* 524 U.S. at 764, 118 S.Ct. 2257. The fact that an employer proactively adopts such a policy is insufficient, in and of itself, to create a genuine issue of material fact regarding whether the sexual harassment committed by an employee was foreseeable. Because Frieler failed to raise an issue of fact with respect to the foreseeability of Janiak's sexual harassment, summary judgment was properly granted on her common law claims of assault and battery.

Reversed and remanded with respect to the MHRA claim, affirmed with respect to the assault and battery claim.

ANDERSON, RUSSELL A., Chief Justice.

I join in parts I–IV of the opinion of Justice Page and in part II of the opinion of Justice Gildea.

ANDERSON, PAUL H., Justice.

I join in parts I–IV of the opinion of Justice Page and in part II of the opinion of Justice Gildea.

MEYER, Justice.

I join in parts I–IV of the opinion of Justice Page and in part II of the opinion of Justice Gildea.

---

20. The dissent contends that we should find that sexual harassment is foreseeable as a matter of law for purposes of respondeat superior. The dissent attempts to justify this dramatic shift in our law by suggesting that the court has found a low level of evidence showing the foreseeability of the sexual misconduct of employees to be sufficient to withstand a motion for summary judgment. The dissent also asserts that requiring evidence of this essential element of a respondeat superi- or claim "would place form over substance" and only places an unnecessary financial burden on plaintiffs. But the fact that a relatively low threshold is sufficient to survive summary judgment cannot justify a complete removal of the requirement. Further, it does not place "form over substance" to require a plaintiff to present sufficient evidence of the necessary elements of her claim to survive summary judgment.

 

ANDERSON, G. BARRY, Justice (dissenting in part).

I join in the opinion and dissent of Justice Gildea.

DIETZEN, Justice (dissenting in part).

I join in the opinion and dissent of Justice Gildea.